In re AUTO TRAIN CORPORATION,
a/k/a Railway Services
Corporation, Debtor.

Murray DRABKIN, Trustee, Plaintiff,

v.

STANDARD COMMODITIES IMPORT &
EXPORT CORPORATION, Defendant.

Bankruptcy No. 80–00391.
Adv. No. 81–0082.

United States Bankruptcy Court,
District of Columbia.

Feb. 19, 1982.

James Kearney, Sandy Feldman, Webster & Sheffield, Washington, D. C., for plaintiff trustee Murray Drabkin.

Charles M. Tatelbaum, Stephen F. Fruin, Baltimore, Md., for defendant Standard Commodities Inc.

## MEMORANDUM OPINION

(Expenses Reasonably and Necessarily Incurred by the Trustee Pursuant to an Oral Agreement)

ROGER M. WHELAN, Bankruptcy Judge.

This adversary proceeding involves a claim filed by Murray Drabkin ("Trustee"),

Trustee for Auto-Train Corporation ("Debtor"), requesting this Court to enter an order authorizing the sale of hopper cars, for cash, free and clear of liens at a public auction with plaintiff debtors rights attaching to the proceeds. In addition, the plaintiff requests that the defendant Standard Commodities Import and Export Corporation ("Defendant") be enjoined from removing or disposing of the hopper cars and that a judgment against the defendant be entered for the expenses incurred under an oral agreement and for costs of storage and security. However, since on August 28, 1981, this Court signed a consent order which provided that the hopper cars could be sold with the interests of the parties attaching to the proceeds of the sale, the only issue left to be decided is what expenses were reasonably and necessarily incurred by the Trustee under the oral agreement and whether the costs of storage and security should be borne by the plaintiff or defendant.

A brief scenario of the events are as follows. On July 30, 1980, Railway Services, Inc. entered into a joint venture agreement with Delta Rail Car, Inc. in order to provide for the construction and the sale or lease of twenty-five covered railroad hopper cars ("hopper cars") for Standard Commodities. Delta Rail Car, Inc. shortly after withdrew from the joint venture. Defendant, however, continued to import the prefabricated hopper car kits and Railway Services, Inc. continued to assemble the hopper cars from these kits at the Debtor's Portsmouth, Virginia facility. On September 18, 1980, the Auto-Train Corporation filed a petition for railroad reorganization in this Court and on November 11, 1980, after a hearing on a motion to amend the caption, Railway Service Corporation was included *nunc pro tunc* in Debtor's petition for reorganization.

Sometime during November 1980, the Trustee informed the Defendant that due to the financial plight of the railroad, RSC could no longer perform under the joint venture agreement and that the Portsmouth facility would be closed. The president of the defendant, Scott Taylor, telephoned the trustee and set up a meeting with the Trustee on November 14, 1980. During that meeting it became apparent that Mr. Taylor and his family had a large personal stake in the completion of the hopper cars. Namely, they had invested $300,000 into the components. (Taylor, Transcript p. 210). An oral agreement was reached on that day whereby the Trustee agreed to keep the Portsmouth facility open to complete the manufacture of the cars, on the condition that the defendant would be responsible for all related costs and expenses that the Trustee would not have incurred had he closed the facility as originally intended. The Trustee agreed that the defendant would not have to pay the rent on the Portsmouth facility as the Trustee would have had to continue to pay the rent anyway. A written agreement was to be entered into subsequent to this meeting setting forth the terms of the oral contract. However, none was ever entered into.

On or about February 20, 1981, the defendant's 25 hopper cars were completed. Thereafter, the defendant attempted to sell the hopper cars but without success. On May 26, 1981, the Trustee filed this complaint to sell the 25 hopper cars and for other relief. On August 28, 1981, by consent order, the parties agreed to the sale of the hopper cars with the stipulation that the proceeds be placed in an escrow account pending the resolution of this proceeding.

There is no dispute by either of the parties that an oral agreement was entered into. It is therefore this Court's task to construct the terms of the oral agreement. Generally, when constructing the terms of a contract it is the Court's duty to attempt to ascertain the intent of the parties, and upon doing that, give the terms of the contract the legal effect intended. *See* 17 Am.Jur.2d, Contracts, § 244 at 631. A contract by its very nature must be definite and certain as to its terms and, in order to be binding on the parties, "the character of the obligation [must be] definitely fixed by an express or implied agreement of the parties." 17 Am.Jur.2d, *Contracts*, § 75 at 413.

In the agreement presently before this Court, it appears that the defendant agreed to pay all the expenses associated with keeping open the Portsmouth facility in order to complete the construction on the hopper cars.[1] The dispute arises as to just what expenses incurred were expenses associated with keeping open the Portsmouth facility in order to complete the construction of the hopper cars. The charges which are disputed by the defendant are the amounts owed to Federal Express, Emery Air Freight, Inc., Diamond Air Compressor, International Business Machines, Preston Trucking Company, Executive Professional Leasing Company, Chubin Security Service, Johnson and Higgins, storage of the hopper cars, National Torch Tip Company, Inc., Hall's Motor Transit Company, the costs associated with the damage to the leased crane,[2] and any and all attorneys' fees connected with this matter.[3]

This Court will discuss each charge individually.

*Federal Express—$246.72*

■ Plaintiff's Exhibit # 3 are the invoices to Railway Services, Inc. from Federal Express. After receiving the testimony of Lou Foster and after reviewing the invoices, it appears that all of the charges were for services regularly utilized by the Portsmouth facility in the course of business. For example, a substantial number of the items transmitted by Federal Express was the payroll of the employees at the Portsmouth facility. Badge plates required for the construction of the hopper cars were also sent via Federal Express. In addition, a package was sent from the Portsmouth facility to PLM, Inc. in Chicago, which was a company which the defendant had conducted business discussions for over two years in contemplation of a sale to them of the hopper cars. While the defendant's president, Scott Taylor, testified that he could not recall instructing RSC to correspond with PLM, Inc. (Taylor, Tr. p. 300) it seems reasonable to this Court to assume that this expense was one incurred in connection with the hopper cars. Therefore, all of the Federal Express charges will be allowed to be billed to Standard Commodities as it appears to fall within the purview of the oral contract in that its an expense associated with the hopper cars.[4]

*Diamond Air Compressor—$5,673.11*

*Emery Air Freight—$836.16*

*Hall's Motor Transit—$784.63*

*Preston Trucking—$31.16*

■ The defendant, through its president's testimony before this Court on Sep-

1. The Trustee at trial testified that his understanding of the agreement was that the defendant would pay "every and all expenses which [the trustee] would incur for running this facility, those expenses were____[those that the Trustee] would not incur if [he] had...closed it down. Drabkin, Tr. at 30. The defendant at trial testified that he "agreed that on November—from November 17th on, [he] would pay all overhead expenses that were incurred by Railway Services...." Taylor, Tr. at 212.

2. The issue of the defendant's liability for the damage to the leased crane was decided on August 28, 1981, when this Court found that this item was not a foreseeable expense under the oral contract. This was affirmed by this Court on September 23, 1981, when it denied the plaintiff's Motion for Reconsideration.

3. The defendant did not dispute the following charges:

Seaboard Coast Line Railroad Company
(for electric utility service) ...........$ 3,682.52
C & P Telephone Co. ................ 964.37

Moss-Dennis Oil Co. ................ 452.34
Portsmouth Gas Co. ................ 441.54
Hampton Roads Welders Supply ...... 5.60
Owsley & Sons, Inc. ................ 3,619.64
Payroll and FICA ................... 16,939.33
Lewis Foster Compensation .......... 6,187.40
Health Insurance ................... 9,081.00
Accrued Vacation ................... 1,240.00
Unemployment Tax ................. 3,889.32

4. In addition, this Court notes that at the continued trial on September 23, 1981, the only objection to the use of Federal Express was for the package sent from the Portsmouth facility to PLM, Inc. (Taylor Tr., p. 235). Mr. Taylor, the president of defendant, stated that he had no idea what was contained in the other packages transmitted. However, this Court finds that the testimony of Lou Foster, as well as the invoices, supports the contention that this was an expense incurred for the completion of the hopper cars.

tember 22, 1981 (Taylor, Tr. pp. 249–253), does not dispute that any of the expenses owed to Diamond Air Compressor, Emery Air Freight, Hall's Motor Transit and Preston Trucking were not expenses provided in conjunction with the hopper cars. Mr. Taylor's only claim is that these expenses were the defendant's sole responsibility and not that of the Trustee's. (Taylor Tr. pp. 249–252). However, this assertion appears to be incorrect as the exhibits and the testimony of other witnesses show that the vendors are looking to the Trustee for payment. The Emery Air Freight invoices (Pl.Ex. # 4), the Hall's Motor Transit bill (Pl.Ex. # 14), and the Preston Trucking invoice (Pl.Ex. # 9) are all being sent to RSC and designate RSC as the party to be billed. In addition, the testimony of Phillip Argetsinger, an employee of Auto-Train, established that a Mr. Ludwig from Diamond Air Compressor called him on occasion "to find out when he could expect payment." (Argetsinger Tr. 119–121). Since there is no dispute that the money is due to these vendors, that they were all expenses incurred in conjunction with the completion of the hopper cars, and that the vendors are looking to the Trustee for payment, this Court finds that the expenses should properly be assessed against the money in the escrow account.

*IBM—$833.05*

Plaintiff's Ex. # 7 shows a bill invoiced to RSC for the rental of two IBM typewriters and one photocopying machine for $833.05. Defendant in its Argument and Memorandum of Law submitted to this Court on October 19, 1981, at page 14, contends that these charges "were not reasonably necessary as overhead charges for the completion of the railway hopper cars." The defendant contends that the Trustee "simply failed to reject the leases (probably because he was unaware of them based upon the many other problems involved in the case) and now the Trustee seeks to charge Standard for 100% of the rental charges for them. It is inconceivable that two typewriters and one copier were needed solely for the use of the Railway Services'

employees solely for the completion of the hopper cars." (*Id.* at 15).

■ This Court finds no evidence to support the defendant's allegations. First, Mr. Foster, the Auto-Train employee who ran the Portsmouth facility, testified that all of the equipment was used in conjunction with the inventory, payroll and correspondence at the Portsmouth facility. (Foster Tr. 349–50). Second, it should be remembered that when the defendant contracted to pay the expenses associated with the completion of the hopper cars, this did not mean that he would only pay for the materials associated with the actual construction of the cars. It meant he would pay for the costs of doing business. In order for the Portsmouth facility to operate—meet its payroll, correspond with vendors associated with the hopper cars, etc.—it was necessary to maintain office equipment on the premises. Since the facility was only open to complete the hopper cars, the defendant should shoulder 100% of the costs of the use of this equipment. If the plant had closed on the day originally scheduled, these costs would not have been incurred.

Third, the defendant contends that probably the Trustee just forgot to reject the leases or the equipment. There is no evidence to support this contention and therefore this Court will not even consider it. Therefore, this Court finds that the IBM charges are properly to be assessed against the defendant and charged against the escrowed account.

*Johnson & Higgins—$4,259.71*

■ The Trustee maintained an all-risk property damage insurance policy on the hopper cars from November 17, 1980 through April 1981. On November 21, 1980, the defendant by letter had itself listed on the policy with Johnson & Higgins as an additional insured by virtue of the oral agreement entered into between the Trustee and the defendant one week before. (See Pl. Ex. # 44) It seems clear to this Court that the policy on the hopper cars would have been cancelled by the Trustee had the Portsmouth facility been closed on

November 14, 1980 as planned. However, since the plant was kept open, the Trustee maintained the insurance on the cars. The defendant had agreed to pay any costs associated with the hopper cars. This is clearly a necessary and foreseeable cost. The defendant argues that since he already had insurance, it was not necessary for the Trustee to maintain the policy. However, the defendant never bothered to inform the Trustee that there was insurance on the cars until April 13, 1981. (Taylor Tr. 320) Further, he did not have a policy written until "sometime between the end of February and the beginning of March." (Taylor Tr. 319) This means that the cars would have been uninsured for close to three months had the Trustee not maintained the policy. Despite the fact that the defendant claims that the hopper cars were "virtually indestructible," it seems clear that any prudent businessperson would have maintained insurance on items that represented over an $800,000 investment. Therefore, this Court finds that the defendant should be charged with this expense and this amount should be charged against the escrowed account.

### Chubin Security—$10,970.72

■ Security coverage at the Portsmouth facility was incurred by the Trustee for the period February 27, 1981 through September 3, 1981. The security services were only provided from the date that the last employee had left the Portsmouth facility until the Trustee was informed by the defendant that the hopper cars would be removed from the facility. (Pl. Ex. # 13, Drabkin Tr. 40–41, Trustee's Post-Trial Memorandum at 11) The Trustee in his testimony stated that he felt it necessary for security to be provided because in his judgment property located at an unoccupied railroad yard would be susceptible to theft and vandalism. (Drabkin Tr. 39–40) Further, there was a $25,000 deductible on the insurance policy which the estate could have been potentially liable for. In addition, since the Trustee did store some property of the estate at Portsmouth, the Trustee is only assessing one-half of the total cost of providing the security at the facility

against the defendant despite the fact that the estate's property at Portsmouth was substantially less than the value of the hopper cars. The Trustee pointed out in his testimony that but for the continued existence of the hopper cars on the premises of the facility, the Trustee would have removed the estate's property located at Portsmouth to the Sanford facility. (Drabkin Tr. 41) The Court finds all of the above reasons sound arguments for why security service was provided. Since it appears that the hopper cars were the most valuable asset on the premises and that the Trustee would have removed the estate's property to the Sanford facility if he had closed the Portsmouth facility as planned, this Court finds the one-half charge for the security service to be properly charged against the defendant. This Court finds that the $10,-970.72 owed to Chubin Security is an expense to be properly charged against the defendant and to be satisfied out of the escrow fund.

### Storage Charges—$39,000.00

■ The Trustee testified that the defendant had agreed to pay those expenses that the Trustee would not have incurred had the facility been closed down as planned. (Drabkin Tr. 30, Taylor Tr. 210, 212) Whatever the terms of the oral contract, once the cars were complete, the contract was complete. However, once the defendant was informed that the contract was complete he had an obligation to either remove the hopper cars or pay appropriate storage charges. While the defendant was attempting to sell the cars, he cannot possibly expect that his property could be stored rent free until such time as he found a buyer. In fact, Mr. Taylor testified at trial that the defendant had considered alternative storage arrangements, but never made any. (Taylor Tr. 324) Had the defendant stored the cars somewhere else he would have had to pay the expenses of storage. Granted, there is no agreement as to the issue of storage charges. However, as the Trustee pointed out "(i)t was fully contemplated that those cars would be assembled,

sold and removed." (Drabkin Tr. at 44) While there was never an agreement to pay the storage charges, the defendant should not be allowed to get a "free ride" because he failed to remove his property.

The defendant argues in his Post-Trial Memorandum at 21–22 that Standard was precluded from removing the cars from the Portsmouth facility upon the filing by the Trustee of his Complaint for an injunction. However, the Trustee was "always . . . amenable and agreeable to the sale and removal of (the hopper) cars. (His) only interest was in the satisfaction (of defendant's obligations) and the preservation of (the Trustee's) security interest." (Drabkin Tr. 38–39)

To allow the defendant to not pay storage charges because of his own failure to remove the property would not be fair. Therefore, this Court will award storage costs of $39,000 against the defendant to be charged against the escrow account.[5]

*Attorneys' Fees*

The Trustee in his Post-Trial Memorandum argues that his "attorneys' fees are expenses which the Trustee would not have incurred had he closed the Portsmouth facility." *See* Plaintiff's Post-Trial Memorandum of October 19, 1981 at 15. Therefore, he postulates that his attorneys' fees incurred as a result of keeping open the Portsmouth facility should be paid by the defendant as it falls under the terms of the oral agreement. However, this Court finds that the defendant is not responsible to the Trustee for his attorneys' fees.

The "American Rule" provides that attorneys' fees are generally not recoverable in federal litigation, absent a statute or a valid contract. *See Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *F.D. Rich Co. v. Industrial Lumber Co.*, 417 U.S. 116, 126, 94 S.Ct. 2157, 2163, 40 L.Ed.2d 703 (1974); *American Security Bank v. John Y. Harrison Realty, Inc.*, No. 79–02768, slip op.

at 10 (D.D.C., December 12, 1982). While there is an oral contract in this case, this Court does not find that attorneys' fees were reasonably contemplated to be included in that contract.

There are limited exceptions to the general principle under the "American Rule" that attorneys' fees are not recoverable. Attorneys' fees may be awarded to the prevailing party when his opponent has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 258–59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975); *F.D. Rich Co. v. Industrial Lumber Co.*, 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974). However, it does not appear that the defendant acted in bad faith when it did not pay the Trustee for service rendered. It appears that there was a legitimate dispute as to just what was to be paid pursuant to the oral contract. Therefore, the Trustee will not be allowed to recover attorneys' fees from the defendant.

---

5. The $39,000 was based on a figure of $8.00 per day per railcar as provided in ICC freight tariff PHJ 6004–L, Supp. 22. This tariff was amended on August 10, 1981 by Freight Tariff PHJ 6004–M which provided that beginning September 1, 1981 the charges for storage would be $30.00 per day.