In re JOHN GRUSS CO., INC., Debtor.

JOHN GRUSS CO., INC., Plaintiff,

v.

PARAGON ENERGY CORPORATION,
Defendant.

Bankruptcy No. 81–20689.
Adv. No. 81–0259.

United States Bankruptcy Court,
D. Kansas.

July 23, 1982.

tered. Defendant, Paragon Energy Corporation (Paragon) appeared by its attorneys, Jeffrey B. Rosen of Miller & Glynn, P. C. and James M. Sheeley, local counsel. Also appearing were: John Gruss, debtor's president; and Alan Cunningham, Paragon's president.

## FINDINGS OF FACT

Upon reviewing the evidence, statements of counsel, pleadings, briefs and exhibits, and the file herein, this Court finds as follows:

1. That this Court has jurisdiction over the parties and the subject matter; and that venue is proper.

2. That prior to June, 1981, Debtor and Paragon had several discussions regarding Debtor entering into a sub-contract to fabricate heating and cooling ductwork for Paragon, which was general contractor on a renovation of a Veteran's Administration hospital in Coatesville, Pennsylvania. They apparently agreed on a price. It is unclear whether they discussed or agreed to any other terms.

3. That on June 4, 1981, Paragon sent Debtor a notice of intent to issue a purchase order (*Pl.Ex. # 1*) and on June 9th (*Pl.Ex. # 3*), Paragon sent the purchase order, quoting a price of $134,118.00. Debtor received the order on June 16th and immediately called Paragon to advise that the order was not acceptable because the quoted price was not in accordance with their previous discussions. Paragon asked Debtor to return the order, so that it could revise the price to $141,618.00, as agreed.

4. That on the same date, Debtor mailed the order back to Paragon. In an attached letter (*Pl.Ex. # 4A*), Debtor proposed three additional terms: (a) a $7,500.00 discount if Debtor completely delivered the order before November 25, 1981 and received full payment before December 31, 1981; (b) invoices were to be paid 2% in 10 days, 1% in 20 days, net 30 days; and (c) if an invoice remained unpaid after 30 days, Debtor could cease further fabrication.

Byron C. Loudon, of McDowell, Rice & Smith, Kansas City, Kan., for plaintiff-debtor.

Jeffrey B. Rosen, of Miller & Glynn, P. C., Kansas City, Mo., James M. Sheeley, Kansas City, Kan., for defendant.

## MEMORANDUM OPINION

BENJAMIN E. FRANKLIN, Bankruptcy Judge.

This matter came on for trial on February 4 and 5, 1982, upon plaintiff-debtor's complaint to recover an account receivable of $19,756.01 plus interest and costs. Defendant answered and counter-claimed for $35,948.16 in damages, plus interest and costs. Plaintiff-debtor, John Gruss Co., Inc. (Debtor) appeared by its attorney, Byron C. Loudon, of McDowell, Rice & Smith, Char-

5. That Debtor began fabrication on June 16th, relying on the oral agreement of price and the June 9th purchase order terms. Most of the purchase order terms were in a standardized form attached to and incorporated in the order, entitled "General Conditions and Instructions".

6. That Paragon revised the order by correcting the price and adding the $7,500.00 discount provision. Paragon did not accept the other two proposed terms.

7. That Debtor received the revised purchase order (*Pl.Ex. # 2*) on June 26, 1981. Debtor called Paragon regarding revision of still another term, involving shop drawings. Paragon agreed to revise that term and debtor approved the revised purchase order, in its final form, on July 2, 1981.

8. That the pertinent terms of the final revised purchase order were:

(a) $141,618.00 price with the $7,500.00 discount provision;

(b) Timely delivery of the materials was of the essence, and in the event of untimely delivery, Paragon could cancel all or part of the order, without penalty;

(c) a merger clause, meaning that the order was a final and complete integration of their agreement, all prior agreement or negotiations were merged into the order, and the order could not be modified or rescinded unless in writing and signed by both parties;

(d) Debtor agreed to comply with all federal laws;

(e) Debtor "... *shall furnish all necessary lien waivers, affidavits or other documents, required to keep the Owner's premises free from liens or claims for lien, arising out of the furnishing of the material and equipment herein, as payments are made from time to time under this purchase order.*"

(f) "*Payment and discount periods shall commence only upon receipt of both the material and proper invoice or invoices. . .*"

9. That Debtor began fabricating on June 16th and shipped the first installment of material on June 19th, with an invoice for $2,540.71 (*Pl.Ex. # 5*). Debtor called Paragon several times after July 19th regarding payment of the invoice. Debtor finally received payment on August 3rd.

10. That Debtor shipped four other installments to Paragon, between July 7 and July 31st. Invoices (*Pl.Exs. # # 6–9*) on these installments totalled $19,765.01 and to date, Paragon has not paid.

11. That on July 20, 1981, Debtor filed for Chapter 11 relief herein.

12. That on August 6th, Debtor called Paragon regarding payment of the July 7th invoice. Eric Bretzel, a Paragon employee, promised to deliver payment on August 7th.

13. That Paragon refused to pay on August 7th because it was on notice of Debtor's bankruptcy and was concerned that Debtor had not been paying its employees and suppliers.

14. That on August 11th, Paragon's president hand delivered to Debtor's president, a letter (*Pl.Ex. # 10*) demanding affidavits from Debtor's suppliers and employees and any other potential claimants against Paragon's payment bond. Debtor refused to supply affidavits from employees or suppliers.

15. That on August 12th, Debtor sent Paragon a letter (*Pl.Ex. # 11*) terminating the contract for non-payment, and advising Paragon that Debtor would pursue collection within the Chapter 11 proceeding.

16. That on August 25th, Paragon sent Debtor a letter (*Pl.Ex. # 12*) advising that it would obtain another subcontractor and charge Debtor for all consequential damages.

17. That on August 27th, Debtor filed an application to reject the executory portion of the contract; said application was sustained on November 6, 1981.

18. That Paragon hired a new subcontractor, after a delay of 19 working days. The new subcontractor, William Sobbe, Inc., charged no more than the balance of Debtor's contract price.

19. That in the 19-day interim between Debtor's termination and Sobbe's com-

mencement, Paragon had to reschedule its laborers to jobs not in the most efficient sequential order. Typically, the ductwork would have been installed first, before pipe-fitting, floors and ceilings, carpentry and painting. Paragon did not have to lay off any laborers, however. Paragon contends that the 19-day delay in ductwork fabrication cost it $35,948.16 plus interest in overhead costs, supervisory wages, and administrative costs. An independent contractor at the site testified that some of Paragon's problems could not be attributed to Debtor's termination, but to other common and inherent difficulties in renovation projects of that kind.

## CONCLUSIONS OF LAW

At the outset, it should be clarified that this is a problem of contract interpretation. There is no dispute that the parties entered into a valid written contract on July 2, 1981, when Debtor accepted the final revised purchase order. Prior to July 2nd, the parties operated on an understanding derived from the terms of the June 9th purchase order and agreed modifications thereof.

The Court finds that the issue herein is who materially breached the contract. Debtor contends that Paragon breached the contract by failing to timely pay the five invoices. Paragon contends that Debtor breached the contract by failing to provide affidavits; and that Debtor's duty to provide affidavits was a condition precedent to Paragon's duty to pay. Debtor's response is that the affidavit term is devoid of meaning or effect; and in the alternative, that Debtor complied with the affidavit term.

### I.

There is no dispute that Paragon did not timely pay the five invoices. Because the contract was silent as to when payments were due [1] the parties adopted the payment term supplied by the Uniform Commercial Code. K.S.A. 84–2–310 states:

*"Unless otherwise agreed (a) payment is due at the time and place at which the buyer is to receive the goods even though the place of shipment is the place of delivery."*

Thus, the parties concluded that payments were immediately due upon Paragon's receipt of each shipment and invoice.[2]

Paragon paid the June 19th invoice on August 3rd. The July 7th, July 21st and two July 3rd invoices were unpaid on August 12th when Debtor rescinded the contract. The evidence was that it took two days to ship (by truck) materials from Debtor's premises to the VA job site. Invoices were mailed on the same date as the shipment. The Court concludes and finds that at the latest, payments were due five days after the date of the shipment and invoice, and that, Paragon did not pay any invoice within said 5 days.

What then was the effect of Paragon's failure to comply with the payment term? Paragon contends that its duty to pay never arose. Debtor contends that Paragon's failure to timely pay was a material breach of the contract. The effect of Paragon's failure to timely pay turns on the meaning of the affidavit term and whether it was a condition precedent to Paragon's duty to pay.

### II.

The threshold question is how should the affidavit term be interpreted? Paragraph 21 of the General Conditions and Instructions states *"Seller shall furnish all necessary lien waivers, affidavits or other documents required to keep the Owner's premises free from liens or claims for liens arising out of the furnishing of the material and equipment herein, as payments are made from time to time under this purchase order."*

---

1. *Paragraph 12 of the General Conditions and Instructions states that payment periods commence upon Paragon's receipt of each shipment and corresponding invoice, but failed to state the length of said payment periods.*

2. *Debtor had contended that payments were due within 30 days of each invoice, but abandoned that contention at trial.*

The General Conditions and Instructions is a standardized form incorporated in Paragon's construction contracts. Paragraph 21 was apparently drafted for contracts between the owner of the premises and Paragon, as prime contractor. Essentially, its purpose was to assure the owner that Paragon had paid its suppliers and laborers, so that said suppliers and laborers could not encumber the owner's property with mechanic liens.

The instant contract is between Paragon, as prime contractor and Debtor, as subcontractor. Debtor contends, therefore, that Paragraph 21 should be ignored, as inapplicable surplusage. First, the paragraph is inapplicable because the owner is not a party to the contract. Secondly, even if the owner were a party to the contract, the paragraph would be inapplicable. No supplier or employee of a prime contractor or of a subcontractor can encumber United States property with a lien. *F. D. Rich Co. v. Industrial Lumber Co.*, 417 U.S. 116, 122, 94 S.Ct. 2157, 2161, 40 L.Ed.2d 703 (1973).

In spite of the apparent inapropos use of Paragraph 21 in the instant contract, Paragon urges the court to give the paragraph a meaningful interpretation. Paragon's position is that the clause means that Debtor must provide affidavits verifying that Debtor has paid its suppliers, employees and any other potential claimants against Paragon's payment bond.

■ Where faced with a choice of finding a term meaningless or meaningful, the court will opt for the latter. *Restatement (Second) of Contracts* § 229 states:

> "*In the interpretation of a promise or agreement or a term thereof, the following standards of preference are generally applicable: (a) an interpretation which gives a reasonable, lawful and effective meaning to all terms is preferred to an interpretation which leave a part unreasonable, unlawful or of no effect.*"

■ In a typical construction contract, unpaid suppliers and employees of a contractor or subcontractor can seek relief by encumbering the owner's property with mechanic liens. The standardized affidavit term in Paragraph 21 was drafted to avoid such a situation. Paragraph 21 requires that the prime contractor give the owner evidence that the suppliers and employees have been paid. Thus, the owner can pay the prime contractor free from apprehension that it will also have to pay unpaid suppliers or employees of the prime contractor or subcontractor, in order to avoid mechanic liens against its property.

In a construction contract involving United States property, however, unpaid suppliers and employees are precluded from perfecting liens against the property. Their remedy lies in the *Miller Act*, 40 U.S.C. § 270a et seq. The Miller Act requires the prime contractor to furnish payment and performance bonds to the United States. Unpaid suppliers and employees must sue on the payment bond for relief. See 40 U.S.C. §§ 270a and 270b.

The position of Paragon is analogous to that of a private owner. Both could be faced with double liability under the contract, that is, payment to the other contracting party and payment to suppliers and employees of the other contracting party. Since Paragraph 21 was originally drafted to protect an owner from double liability, it should be interpreted analogously to protect Paragon, as prime contractor, from double liability. The court therefore adopts Paragon's interpretation. Paragraph 21 means that Debtor must furnish all necessary lien waivers, affidavits, or other documents required to keep Paragon free from claims against the payment bond.

Furthermore, Debtor should be bound by this interpretation, in spite of its protests to the contrary. *Restatement (Second) of Contracts* § 227(2) states:

> "*Where the parties have attached different meanings to a promise or agreement or a term thereof, it is interpreted in accordance with the meaning attached by one of them, if at the time the agreement was made ... (b) that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party.*"

The evidence showed that Paragon had no reason to know that Debtor considered Paragraph 21 devoid of meaning; but Debtor did have reason to know of Paragon's interpretation. Debtor's president testified to his familiarity with government contracts and the Miller Act. Surely Debtor knew about the payment bond required of prime contractors and the potential for double liability. Surely Debtor knew that a prime contractor could demand some sort of protection from double liability in consideration of its payment of the subcontractor. The Court finds that Debtor knew the intended meaning of the language of Paragraph 21, albeit inapropos language.

### III.

Given that Debtor had a duty to provide affidavits, the next issue is whether the fulfillment of that duty was a condition precedent to Paragon's duty to pay.

A condition precedent is an act or event, other than the lapse of time, which must exist or occur before a duty of immediate performance of a promise arises. In the event a condition precedent is not satisfied, the duty of the other party under the contract to perform is discharged. *Restatement (Second) of Contracts* §§ 250 and 251(1).

Whether a provision in a contract is a condition, the nonfulfillment of which excuses performance, depends upon the intent of the parties, to be ascertained from a fair and reasonable construction of the language used in the light of all surrounding circumstances. 5 *Williston on Contracts* (3d ed.) § 663.

■ Here Paragon agreed to pay Debtor with the understanding that Debtor would pay its own expenses, including suppliers and employees. An essential part of Paragon's bargain was its right to a continuing sense of reliance and security that Debtor was paying any potential claimants against Paragon's payment bond, so that Paragon would not be exposed to paying twice for the same goods. The reasonable inference is that Paragon wanted affidavits enclosed with each invoice. Paragon could then pay

each invoice with the assurance that the suppliers and laborers on that particular invoice had been paid. Otherwise, the affidavit term would be of no value to Paragon. If Debtor could send affidavits at any time, Paragon would be forced to pay the invoices upon receipt, without any assurance that potential bond claimants had been paid. The Court concludes, therefore, that Debtor's duty to provide affidavits was a condition precedent to Paragon's duty to pay each invoice. As aptly enunciated in *Murray on Contracts* § 148, at 293–294 (1974):

> "*Frequently a provision in a contract will be of no practical value to the party for whose benefit it was included, unless it be interpreted as a condition... In such a case the provision will normally be interpreted as a condition, so that it may have real effect.*"

### IV.

Debtor's alternative argument was that it complied with the affidavit term. The Court heard two versions of what transpired at the August 11th meeting between the parties' presidents. Paragon contends that Debtor refused to provide affidavits then and in the future, but orally assured Paragon that suppliers were paid c.o.d. and that employees were paid promptly because they were unionized.

■ Debtor contends that it offered a personal affidavit from John Gruss, but not affidavits from suppliers and employees. Debtor felt that neither supplier nor employee affidavits were necessary; and Paragraph 21 only called for "necessary" affidavits. Debtor further contends that supplier affidavits were unnecessary because no supplier could trace his sheet metal to the ductwork supplied to the VA. However, a supplier need only have a good faith belief that his materials were used in the project to recover under a payment bond. *U. S. for Use and Benefit of Carlson v. Continental Cas. Co.*, 414 F.2d 431 (5th Cir. 1969).

■ Debtor also contends that employee affidavits were unnecessary because un-

ion employees were always paid promptly and because none of its employees actually worked at the VA job site. With respect to the first contention, written evidence of payment of employees is a reasonable request in light of a prime contractor's potential for double liability. See *Naylor Pipe Co. v. Murray Walter, Inc.*, 421 A.2d 1012, 120 N.H. 696 (1980). A prime contractor shouldn't have to rely on oral assurances. With respect to the second contention, an employee of a subcontractor can recover against the prime contractor's payment bond whether the employee worked at the construction job site or not. See 40 U.S.C. § 270b.

█ The Court finds that Debtor refused to provide anything. The fact that Debtor failed to offer affidavits from itself or from potential bond claimants in any of its subsequent communications with Paragon indicates that Debtor never made such an offer in the first place. In its termination letter of August 13th, Debtor called Paragon's demand for affidavits a "sham and lame excuse". In its letter of August 27th, Debtor told Paragon that it was willing to resume performance upon receipt of full payment for past invoices, yet Debtor did not offer any affidavits. The Court thus concludes that Debtor breached the affidavit term, first by failing to provide affidavits with each invoice, as required by the contract; and secondly, by refusing Paragon's demand for adequate assurance of future performance.

At the August 11th meeting, Paragon, on notice of Debtor's bankruptcy and being skittish about Debtor's failure to provide affidavits, demanded affidavits before it would pay the invoices. This was Paragon's right, pursuant to K.S.A. 84–2–609, which states in pertinent part:

"Right to adequate assurance of performance.

(1) *A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the*

*other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.*

\*   \*   \*   \*   \*   \*

*(4) After receipt of a justified demand failure to provide within a reasonable time not exceeding thirty days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract."*

█ The Debtor unequivocally indicated in its letter of August 12th that it would not comply with Paragon's demand for affidavits. That constituted a repudiation entitling Paragon to suspend performance and resort to any remedy for breach. K.S.A. 84–2–610. Paragon chose the remedy of cover, K.S.A. 84–2–712, and so notified Debtor by letter on August 25th.

## V.

█ The final issue is that of damages. Paragon owed Debtor $19,756.01 for the July 7, July 21 and July 30 invoices. Paragon argues, however, that its liability is totally offset by Debtor's liability for consequential damages arising from Debtor's breach of the contract. Paragon contends that such consequential damages total $35,948.16.

When a buyer chooses the remedy of cover, under K.S.A. 84–2–712, its damages are the difference between the contract price and cover price, plus any incidental or consequential damages, but minus any expenses saved in consequence of the breach. Incidental and consequential damages are defined in K.S.A. 84–2–715 as follows:

*"(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.*

*(2) Consequential damages resulting from the seller's breach include*

*(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; . . ."*

Nineteen working days after Debtor's repudiation, Paragon secured a substitute subcontractor. The cover price was no greater than the balance of the original contract price. (See *Pl.Ex. # 14*). Paragon contends, however, that the 19-day delay in ductwork fabrication forced it to alter its manner, method and sequence of work, causing additional supervisory and administrative expenses, and extending field overhead for 19 days.

Apparently, ductwork installation was one of the first steps in the renovation. However, the absence of ductwork did not stall all work on the project. Paragon admittedly did not layoff anyone, but rescheduled all laborers into productive work.

Paragon's $35,948.16 counterclaim breaks down as follows:

1) Additional supervisory labor to reschedule laborers (2 foremen @ 24 hrs. of labor) . . . . . . . . . . . . . . . . . . . . . $1,003.68
2) Additional administrative costs to reschedule laborers (salaries, telephone, mailings) . . . . . . . . . . . . . . . . . $4,750.00
3) Field overhead for addt'l 19 days . . . . . $30,194.48

This Court has no qualms with the first two damage items. The evidence showed that Debtor's repudiation necessitated rescheduling, because ductwork was an initial stage of the project. The Court questions the third item of damage, however. There was no evidence whatsoever that the 19-day delay in ductwork fabrication in effect extended the overall completion time of the project by 19 days. In fact, Paragon did not demonstrate that the ductwork delay caused any delay in the overall completion of the project. By Paragon's own admission, productive work continued during those 19 days, albeit less cost efficient work. In fact, work continued as scheduled in the

hospital rooms. Since the ductwork was to be installed only in the hallways, only work on the hallways had to be rescheduled.

Moreover, there was evidence of other delays. At the time Debtor became subcontractor, the project was running behind due to a breach by a prior ductwork subcontractor. After Debtor's repudiation, unrelated problems caused still further delay.

Accordingly, this Court finds that the evidence does not support Paragon's claim for extended field overhead of 19 days. Paragon's counterclaim will be allowed in the amount of $5,753.68 and disallowed in the amount of $30,194.48. Debtor's claim for $19,756.01 is therefore offset by Paragon's counterclaim in the amount of $5,753.68. Accordingly, $14,002.33 remains due and owing to Debtor from Paragon. Judgement is granted to Debtor in the amount of $14,002.33 plus 12% interest. Costs will not be assessed against either party.

THIS MEMORANDUM SHALL CONSTITUTE MY FINDINGS OF FACT AND CONCLUSIONS OF LAW UNDER BANKRUPTCY RULE 752 AND RULE 52(a) OF THE FEDERAL RULES OF CIVIL PROCEDURE.