**AUSTIN ELCON CORP., Plaintiff,**

v.

**AVCO CORP., Defendant.**

**Civ. A. Nos. A–81–CA–150, A–81–CA–153.**

United States District Court,
W.D. Texas,
Austin Division.

May 29, 1984.

Joseph Latting, Donald Scott Thomas, Clark, Thomas, Winters & Shapiro, Austin, Tex., for plaintiff.

John J. McKetta, Robert M. Roller, Graves, Dougherty, Hearon, Moody & Garwood, Austin, Tex., for defendant.

## MEMORANDUM OPINION

JACK ROBERTS, Senior District Judge.

This is a suit by a subcontractor against a prime contractor and its sureties upon a performance bond. The action was brought under the Miller Act, 40 U.S.C.A. §§ 270a–270d (West 1969 & Supp.1984). The subcontractor, Austin Elcon Corp., contends that the prime contractor, Avco Corp., is withholding payment for delay costs and extra work that the parties had agreed on in the course of a contract for construction and electrical wiring at several Air Force bases. Avco has filed a counterclaim against Elcon for the cost of completing and correcting Elcon's work.

The case was tried before the Court without a jury. The Court has considered the pleadings, the testimony of the witnesses, the documents, and the stipulations of the parties. This memorandum opinion constitutes the Court's findings of fact and conclusions of law as required by Federal Civil Procedure Rule 52. For the reasons set forth in this opinion, the Court grants judgment for the defendant.

### FINDINGS OF FACT

Avco contracted with the Air Force to install energy monitoring control systems at eight Air Force bases. Avco subsequently entered into a subcontract with Elcon to perform electrical and construction work called for in the prime contract. The subcontract was in the amount of $1,609,593 and called for Elcon's work to begin in September 1979 and to be completed by June 1980. In the negotiations between Avco and Elcon, Will Bullock represented Elcon, and Gordon Hurd represented Avco. Bullock originally bid only on work to be performed at Bergstrom AFB in Austin, Texas. At Hurd's invitation, Bullock prepared a bid to perform the electrical work on all the bases.

To enable Elcon to calculate its bid, Avco provided Elcon with a copy of the prime contract, which contained the Air Force specifications for the work, and a set of field sketches for each base. Bullock understood that the Air Force specifications would prevail over any understandings between Avco and Elcon as to the work required. Despite this knowledge, Bullock—and others at Elcon who prepared the bid—remained unaware of important details in the specifications until after Elcon submitted its bid on September 9, 1979.

On September 11, 1979, after Elcon had submitted its bid for the eight bases but before a final agreement had been reached, Bullock met with Avco representatives and others in Huntsville, Alabama, to discuss the work to be performed. At this meeting, Bullock learned that significantly more wire than he had expected might be required to install the equipment. Specifically, Avco informed Bullock that the installation of certain sensors, called analog sensors, would require four wires instead of two wires. Although Hurd told Bullock that "they would take care of it down the line," no definite agreement was made concerning the change.

Immediately after the September 11 meeting, Bullock prepared new estimates of the amount of wire that would be required. Bullock did not, however, notify Avco of his revised estimates until a year later, in September 1980.

Between September 20, 1979, and October 15, 1979, representatives for Avco and the president of Elcon, Donald Hoffman, signed purchase orders setting forth the work Elcon was to do and the amount it would be paid. Eight purchase orders were executed, one for each Air Force base. The purchase orders constitute the subcontract agreement between Avco and Elcon. In the purchase orders, "Buyer" refers to Avco and "Seller," to Elcon.

The purchase orders were executed on an Avco form. On its reverse side under a

heading, "PURCHASE ORDER TERMS AND CONDITIONS," the purchase order form states, *"This purchase order constitutes the entire agreement* between the Seller and the Buyer *and may be changed or modified only by written instrument* signed by Buyer's authorized representative" (emphasis added).

A paragraph headed *"Changes"* set forth the procedure by which Elcon was to respond to written change orders:

> Buyer may at any time by a written order ... make changes within the general scope of this order.... If any such change causes an increase or decrease in the cost of, or the time required for, performance of this order, an equitable adjustment shall be made in the price or delivery schedule.... Any claim for adjustment under this Article must be asserted within twenty (20) days from the date of notification of the change: Provided, however, that the Buyer, if it decides that the facts justify such action, may receive and act upon any such claim asserted at any time prior to final payment *under this order....*

The subcontract therefore required Elcon to notify Avco of any price adjustments within 20 days of receiving a written change order.

Each order states that it is "subject to specifications, terms and conditions stipulated and/or referenced herein and on the reverse side hereof. No agreement or understanding at variance herewith shall be binding upon the Buyer unless in writing and signed by its duly authorized representative." Immediately to the left of the seller's signature line is the statement: "Your Order is accepted subject to specifications, terms and conditions stipulated and/or referenced therein and on the reverse side thereof." On each purchase order the following statement is typed: "Terms and conditions as stipulated in the Air Force contract will take precedence over those specified on this order."

The agreement between Avco and Elcon therefore expressly incorporated into the subcontract the provisions of the prime contract, the Air Force specifications in the prime contract, and certain Armed Services Procurement Regulations (ASPR).

In the course of performing the contract, Bullock and others at Elcon discovered that in several ways, their understanding of how the job was to be performed differed from Avco's and the Air Force's understanding. The Air Force insisted that runs of wire be installed without splices in accordance with a "no-splice rule" in the specifications. There was a dispute about whether the specifications required two-pair overhead cable or multiple-pair cable. In another instance, Elcon contends that Avco had led it to believe that a certain type of switch would be used in the system. When the Air Force refused to change the specifications, Elcon had to use a switch that was more expensive to install. As Bullock explains it, he found himself in the position of having to install wiring and materials differently than he had bid the job. Bullock maintains that throughout the job, he relied on Hurd's assurance at the September 17, 1979, meeting that "they would take care of it down the line." When Elcon got to a point "down the line" at which it desperately needed cash to continue, Avco's refusal to pay the additional costs made Elcon feel it had been "sold down the river." Hence, this lawsuit.

## CONCLUSIONS OF LAW

■ The threshold issue is the choice of law. The Supreme Court has held that "the scope of the rights created [by the Miller Act] are matters of federal not state law." *F.D. Rich Co., Inc. v. United States ex rel. Industrial Lumber Co., Inc.*, 417 U.S. 116, 127, 94 S.Ct. 2157, 2164, 40 L.Ed.2d 703 (1974) (holding that liability for attorneys' fees in Miller Act litigation is matter of federal law). However, as to matters in Miller Act litigation that do not require construction of the statute, state law provides the governing rule. *United States ex rel. Riley v. Diran Co.*, 597 F.2d 446, 447 n. 1 (5th Cir.1979).

This is an action on a contract negotiated and performed in several states, involving

parties from different states. The question thus arises as to which state's contract law to apply. The rule is clear that "a federal district court adjudicating a state law issue must apply the law of the forum, including that state's choice-of-law rules." *System Operations, Inc. v. Scientific Games Development Corp.*, 555 F.2d 1131, 1136 (3d Cir.1977). Accordingly, this Court must look to Texas conflicts law.

■ "[T]he Texas conflict of laws rule is that it will apply the law of the state expressly or by implication agreed upon by contracting parties to govern...." *Aboussie v. Aboussie*, 441 F.2d 150, 155 n. 6 (5th Cir.1971). The purchase orders do not contain a choice-of-law provision. But the parties have briefed only Texas law and have assumed that it governs the controversy. The Court instructed the parties to submit supplemental briefs discussing choice of law. Both parties argued that Texas law applies. The Court will therefore "follow the lead of the contracting parties at this juncture" and apply Texas law. *Id.; see also Kutka v. Temporaries, Inc.*, 568 F.Supp. 1527, 1533 (S.D.Tex.1983) (applying Texas law despite contract provision stating that DC law governed).

Elcon's theory of recovery in this action is (1) that when Elcon was preparing its bid, Avco told it to assume that certain specifications could be ignored, (2) that this understanding was part of the contract, (3) that Avco promised to reimburse Elcon for any extra cost of performing the work differently than Elcon had bid the job, and (4) that by telling Elcon how to perform the work and by accepting Elcon's work, Avco waived the provision in the purchase orders that the agreement could be modified only by written statement.

The decision of this case thus involves the application of Texas law to the interpretation of a contract and to the admission of parol evidence in aid of its construction. The applicable principles may be summarized as follows:

> [W]here an unambiguous writing has been entered into between the parties, the courts will give effect to the inten-

tion of the parties as expressed or as is apparent in the writing. In the usual case, the instrument alone will be deemed to express the intention of the parties for it is objective, not subjective, intent that controls.

*Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 731 (Tex.1981).

■ When a question relating to the construction of a contract or its ambiguity is presented, a court is to interpret the wording of the contract in the light of the surrounding circumstances. *Id.*

> If, in the light of surrounding circumstances, the language of the contract appears to be capable of only a single meaning, the court can then confine itself to the writing. Consideration of the facts and circumstances surrounding the execution of a contract, however, is simply an aid in the construction of the contract's language. There are limits. For example, when interpreting an integrated writing, the parol evidence rule circumscribes the use of extrinsic evidence.

*Id.* Finally, "[o]nly where a contract is first found to be ambiguous may the courts consider the parties' interpretation.... Where the meaning of the contract is plain and unambiguous, a party's construction is immaterial." *Id.* at 732.

■ Applying established rules of construction in light of the surrounding circumstances, the Court holds that the language of the purchase orders is unambiguous and that the purchase orders constitute the entire agreement between Avco and Elcon. Under Texas law, all previous understandings between Avco and Elcon were thereby integrated into the purchase orders, and the parties agreed to make changes only by written instrument. By its acceptance of the purchase orders, Elcon agreed to perform its work in accordance with the incorporated provisions, specifications, and regulations. The Court finds that there is insufficient evidence in the surrounding circumstances to warrant Elcon's assumption that under the contract, it could perform the work in a manner at

variance with the specifications and that Avco would reimburse it for any extra cost it might incur if it were required to meet the specifications.

The remaining issues are whether the requirement in the purchase orders that modifications be in writing is enforceable under Texas law and, if so, whether Avco waived the requirement or is estopped from enforcing it. "Generally, a provision in a construction contract providing that any alterations or deviations must be executed in writing is binding, and there can be no recovery unless the writing requirement is met.... However, such a provision can be waived by the actions and conduct of the parties." *Texas Construction Associates, Inc. v. Balli*, 558 S.W.2d 513, 521 (Tex.Civ. App.—Corpus Christi 1977, no writ) (citing *State v. Martin Bros.*, 138 Tex. 505, 160 S.W.2d 58 (1942)).

In *Sterling Projects, Inc. v. Fields*, 530 S.W.2d 602 (Tex.Civ.App.—Waco 1975, no writ), the court held that where a general contractor ordered extra work and therefore knew about it, he could not enforce requirement that the subcontract submit its claim for the extra work in time for the general contractor to submit the claim to the owner. But where the contractor and subcontractor disagreed at the time of performance over whether the work was outside the scope of the contract, Texas courts have held that the subcontractor could not recover the cost of the work where he had not obtained a written agreement in connection with the work. *Chambless v. J.J. Fritch, General Contractor, Inc.*, 336 S.W.2d 200 (Tex.Civ.App.—Dallas 1960, writ ref'd n.r.e.).

As to waiver and estoppel, Texas courts have observed that waiver can be either an "intentional relinquishment of a known right or intentional conduct inconsistent with claiming it." *Massachusetts Bonding and Insurance Co. v. Orkin Exterminating Co., Inc.*, 416 S.W.2d 396, 401 (Tex. 1967). "Estoppel arises where by fault [or conduct] of one, another has been induced to change his position for the worse." *Id.* The general principle appears to be that "[w]aiver depends solely on what the obligor does; estoppel depends on what he has caused his adversary to do." *Tex-Craft Builders, Inc. v. Allied Constructors, Inc.*, 465 S.W.2d 786, 793 (Tex.Civ.App.—Tyler 1971, writ ref'd n.r.e.).

■ The Court holds that there is insufficient evidence to conclude that Avco waived the requirement that modifications to the contract be executed in writing or to conclude that Avco's conduct estops it from enforcing that requirement. Elcon's main evidence to the contrary apparently is Bullock's testimony that according to Hurd, "They would take care of it down the line." Bullock admits, however, that there were few conversations about the alleged extra work; significantly, he does not maintain that the assurance was later repeated. And even if the statement had been made after the purchase orders were executed, it would not constitute sufficient conduct for a reasonable person to believe that Avco had waived the writing requirement. The Court holds that Avco did not waive the requirement that modifications to the contract be executed in writing and holds also that Avco's actions do not estop it from enforcing the requirement.

Applying the foregoing principles, the Court can determine the merits of Elcon's individual claims and of Avco's counterclaim:

■ *Elcon Inside-Wire Claim.* Part of the dispute between Avco and Elcon centers on whether certain work performed by Elcon was outside the scope of the subcontract and whether Elcon should therefore receive extra compensation for that work. Elcon submitted a claim for "extras" by letter on September 24, 1980, and the extras can be divided into several categories.

Elcon claims, and Avco concedes, that the additional pair of wires for the analog sensors constituted a change from the original specifications in the prime contract and that it agreed to pay any resulting extra costs. Elcon has not, however, provided either Avco or the Court with a reliable

estimate of extra amount of wire that this change required.

Analog sensors accounted for approximately 20% of the sensors installed. The change in the specifications did not affect the length of any runs of wire from sensors to computers. Assuming that the analog sensors required the same amount of wire on average that the other sensors required, the additional pair of wires meant that about 20% more wire was required. In calculating its bid, Elcon estimated that the job would require 434,950 feet of inside wire. Applying the 20% factor to Elcon's figure, the Court concludes that the change in wiring the analog sensors required 86,-990 feet of extra wire.

In testimony, Bullock admitted that in a February 10, 1981 letter to Hurd, he stated that an appropriate price to charge for the extra wire was $68.80 per thousand feet. The Court finds that $68.80 is the price agreed upon by the parties. The cost of the extra wire for the analog sensors was therefore $5,985.

Elcon claims that Avco should pay it for extra labor required to install the two-pair wire on the analog sensors. In his testimony, however, Bullock admitted that installing the two-pair wire did not require extra labor. Accordingly, the Court holds that Avco does not owe Elcon for extra labor to install the two-pair wire.

Similarly, Elcon claims that Avco should pay it for extra conduit required to install the wire. Elcon did not provide evidence that the change to two-pair wire required additional conduit. Moreover, Hurd testified that the change required neither extra conduit nor larger conduit. The Court finds that the evidence does not support Elcon's claim for the cost of extra conduit. It follows also that Avco does not owe Elcon for extra labor to install conduit. The Court holds that Avco and Elcon have settled the inside-wire claim in full.

■ *Elcon Outside-Wire Claim.* Elcon submitted a separate claim for extra charges based on what it said was a change in the specifications for the overhead cable

it strung between buildings. According to Bullock, he had bid the job on the understanding that two-pair wire was required for the overhead cable. He said he first learned that multiple-pair wire would be required when he met with the Avco supervisors in the fall of 1979.

Avco maintained at that time and in court that the specifications have never been changed—that they have always called for two-pair cable. Avco concedes that Elcon strung multiple-pair cable, but only on parallel runs of cable where it made more sense to run one multiple-pair cable than several two-pair cables.

Attachment 1 of the prime construction contract is the specification, entitled Division 13, that defines the hardware requirements for the eight energy monitoring control systems. The specification provides, at page 13E–3, paragraph 3.2, "Interface: All interfaces between the data communications equipment and the CCC, FID, or MUX shall be in accordance with EIA, RS–232C. The equipment provided shall allow operation in either a half-duplex (2 or 4 wire) or full-duplex mode of operation as required by the CCC and FID."

In his testimony, Bullock admitted that this section of the specifications was "a technical spec written in language that was a little out of our realm," and that to him, it was "like reading Greek." Bullock testified, however, that he learned early in the project that Avco interpreted the clause to specify two-pair wire. He admitted also that based on what he has later learned, he realizes that the original specifications called for two-pair wire in the overhead cable.

The evidence thus supports Avco's contention that it did not change the requirements for the overhead cable. Moreover, the rule applied by the court in *Chambless*, 336 S.W.2d 200, would deny recovery to Elcon where it and Avco disagreed at the time of performance over whether the work was outside the scope of the contract and where Elcon did not obtain a written agreement modifying the contract. Accordingly, the Court holds that none of

Elcon's work on the overhead cable constituted extra work outside the scope of the contract. Avco is therefore not liable to Elcon for any costs related to the overhead cable.

On October 17, 1980, Elcon billed Avco for 50 extra items. In response, Hurd sent Elcon a check for $19,931.18, which he testified was full payment for 35 of the 50 items and an agreed-upon partial payment and full satisfaction for a 36th item. After meeting with Bullock to discuss the remaining items, Hurd sent Elcon a second check, for $15,144.13. Avco contends that the second check was tendered and accepted as full satisfaction of the remaining items. Bullock, in his testimony, conceded that Elcon had received full satisfaction for all but eight of the items. Thus, it is only those eight items—which concerned differential paddle switches (DPSs)—as to which there is any dispute.

█ Elcon contends that Avco had led it to believe that paddle switches could be used instead of DPSs. Elcon therefore claims that Avco should pay it for extra labor and materials it says the DPSs required. Hurd denies telling Bullock to assume that he could use paddle switches.

Bullock admitted in his testimony that the original Air Force specifications required DPSs, not paddle switches. On page 13B–9 of Attachment 1 to the prime contract, paragraph 3.5.9 requires that filter pressure drop, air flow, and water flow be sensed by DPSs.

There was thus no change in the specifications regarding the DPSs. Since the Air Force specifications took precedence over any other understandings, by accepting the purchase orders Elcon agreed to provide labor and materials to install the DPSs. The work was within the scope of the contract, and Avco is not liable to Elcon for costs relating to DPSs. The Court holds that Avco has paid Elcon's October 17, 1980, billing in full.[1]

█ Part of Elcon's claim consists of a list of miscellaneous billings, submitted as Exhibit 3 in Elcon's Exhibit 50. The basis of the various claims is unclear. Bullock testified that he had personal knowledge of and was responsible for the first four items in the list, but that it had been too long since he had worked with the items for him to explain the claims. Donald Hoffman testified that he had prepared the fifth item, but stated only that it was based on a change order in March 1981.

Avco argues that one of the bills—for carpeting—should be sent to the Air Force. Avco points to the testimony through deposition of Michael Cawley, the Air Force inspector at MacDill AFB. Cawley testified that he had authorized the carpet to be installed on behalf of the Air Force and that Avco had nothing to do with it. As to the other items, Avco argues that it is likely that they represent double billing by Elcon. During the trial, Avco pointed out several invoices that were improperly included by Elcon in the records supporting its claim. In light of those and other discrepancies, the Court can give little credence to claims by Elcon that are not backed up by evidence. The Court holds that Elcon has failed to substantiate these claims against Avco.

█ *Elcon Delay-Expense Claim.* The bulk of the remainder of Elcon's claim consists of charges arising from delay-related expenses. The charges consist of labor, overhead, and other expenses incurred by Elcon from some date after it had been scheduled to finish to September 1981. After reviewing Elcon's claim, the Court concludes that Elcon did not incur additional costs because of delays caused by Avco.

Elcon claims that its work was significantly delayed by shortages of materials, primarily sensors, that Avco was to deliver to the Air Force bases. Elcon claims also that Avco was late in providing it with approved field drawings so that it could determine where to install equipment.

---

**1.** The Court notes that even if the evidence indicated that the DPSs were not specified by the Air Force, the *Chambless* rule would prevent recovery by Elcon.

Avco responds in several ways. One, Hurd testified that on less than a dozen occasions did Elcon notify Avco that it was short of sensors and that whenever it was notified, Avco delivered the material within a few hours. Two, Avco's site supervisors state that at all times that Elcon had employees on the bases, there was work for them to perform and that Elcon did not incur costs because of idle crews. The site supervisors testified that shortages of sensors did not delay Elcon. Three, Avco points out several unanticipated difficulties (such as the no-splice rule and defective overhead cable) encountered by Elcon in the course of the project that were Elcon's fault and that Elcon admits increased the amount of work it had to do. Four, Avco maintains that it relaxed Elcon's work schedule in early spring 1980 to allow Elcon to employ its work force less intensively. According to Avco, Elcon took advantage of the extra time and decreased its work force. Thus, Avco argues, the fact that Elcon incurred costs after its original completion date does not imply that it incurred greater costs. Last, Avco maintains that the field sketches it provided Elcon were sufficient for it to begin work and that Avco paid for any cost due to changes in the plans.

On the basis of the preponderance of the evidence, the Court finds that Elcon was not significantly delayed by a lack of field drawings or by shortages of materials supplied by Avco. The Court finds also that the delay at the start of the project and the extension of the work beyond the original completion date did not increase Elcon's costs.

■ Elcon's claim against Avco includes the 5% retainage that Avco has withheld pursuant to the subcontract. Avco continues to withhold the retainage in accordance with an indemnity and security agreement between it and Elcon. That agreement provides that the "retainage may be withheld until the term of this Indemnity expires." The term of the indemnity agreement runs until the litigation between Elcon, one of its suppliers, and Avco is finally adjudicated. By stipulation of the parties, that litigation is not yet final. The Court therefore concludes that under the provisions of the indemnity agreement, Avco does not presently owe the retainage to Elcon.

■ *AVCO Counterclaim.* Avco submitted a detailed claim against Elcon to recover costs necessary to complete and correct deficiencies in Elcon's work. Elcon has not challenged Avco's counterclaim. After reviewing the record developed by Avco, the Court concludes that most of the items claimed are well supported by testimony and evidence. Several items, however, appear to be only rough estimates of the costs Avco has incurred or expects to incur, and the Court cannot accept them at face value.

Avco's largest claim is for $105,000, which it claims is the cost of extra time that its crew, supervised by Al Apice, spent correcting Elcon errors. Apice testified through deposition that his detailed estimates were very rough and done from memory "on the spot," i.e., at the deposition. Apparently no records exist to support his recollections. The Court finds that Apice's testimony is a reasonable basis for awarding $66,500 as extra labor costs for the Apice crew.[2]

■ Avco claims that it incurred $6,000 in management time at its headquarters and $80,000 in management time of its site supervisors. Avco offered no evidence showing that Elcon errors increased its headquarters management costs. Nor did Avco offer evidence that its site supervisors had to stay on the job longer. These costs appear to be more in the nature of

---

**2.** Apice testified about the amount of time that his crew spent at each base. His testimony supports the following number of manweeks for each base: Holloman—8, Clovis—8, Shaw—12, Myrtle Beach—8, MacDill—14, Bergstrom—24, England—18, and Hurlburt—10, for a total of 102. Apice apparently expected to spend eight manweeks per base to perform Avco's work; the Court concludes that 38 manweeks were spent correcting Elcon's work. Based on the cost figures supplied by Avco, the cost of the extra time is $66,500.

fixed costs than variable costs. They do not appear to the Court to be dependent on the quality of Elcon's work. The Court therefore concludes that Avco's management costs are not allocable to Elcon on the basis of Elcon errors.

■ An Avco site supervisor, Robert Howell, testified through deposition that Avco had spent $600 to replace cable. He stated also that he expected, "off the top of his head," that Avco would spend an additional $1500 or more to replace cable. The Court accepts his estimate of past costs, but cannot treat his estimate of future costs as a reasonable basis on which to award damages to Avco.

The Court has reviewed each item in the counterclaim and concludes that with the exception of those items discussed above, Avco's claims against Elcon for the cost of correcting deficiencies in Elcon's work are well supported by the evidence. Accordingly, the Court finds that Avco incurred a total of $191,460 in costs to correct Elcon's deficiencies.[3]

■ *Avco Usury Claim.* In addition to its counterclaim against Elcon, Avco argues that Elcon has violated a Texas usury statute, Tex.Rev.Civ.Stat.Ann. art. 5069–1.-03 (Vernon Supp.1984), and is therefore liable to Avco for penalties, Tex.Rev.Civ. Stat.Ann. art. 5069–1.06 (Vernon Supp. 1984). Under article 5069–1.06, "any person who contracts for, charges or receives interest" in excess of the statutory ceiling is subject to penalty. The only evidence of an attempt by Elcon to collect interest from Avco is an "Audited Statement of Account" apparently prepared after Elcon had initiated this action and submitted to Avco and the Court in connection with this action.

Texas courts have held that the term "charges" in article 5069–1.06 means "unilaterally placing on an account an amount due as interest." *Rheiner v. Varner,* 627 S.W.2d 459, 465 (Tex.App.—Tyler 1981, no writ), or "the inclusion [of interest] in a statement of indebtedness submitted to the debtor," *Concrete Construction Supply, Inc. v. M.F.C., Inc.,* 636 S.W.2d 475, 477 n. 1 (Tex.App.—Dallas, no writ).

None of the several invoices, ledgers, and letters demanding payment show any charge for or make any claim for interest. There is no evidence that Elcon has charged interest on its accounts. The Court holds that the statement prepared by Elcon in connection with this action did not constitute "charging interest," as that term is defined by Texas courts. *See Tyra v. Bob Carroll Construction Co.,* 618 S.W.2d 853 (Tex.Civ.App.—El Paso 1981), *aff'd,* 639 S.W.2d 690 (1982) (holding that a pleading seeking interest did not constitute charging usurious interest where plaintiff had not sought to charge interest prior to litigation).

The Court finds that no interest was charged. Elcon is therefore not liable to Avco for penalties under Texas usury law.

■ There is, however, a more significant consideration that impels the Court to conclude that Elcon's pleading is not subject to the restrictions of Texas usury law. Because Elcon's billings contain no reference to a charge for interest, the Court construes the interest charge in its pleadings to be a request to the Court for prejudgment interest. Under the Supreme Court's decision in *F.D. Rich,* 417 U.S. 116, 127, 94 S.Ct. 2157, 2164, 40 L.Ed.2d 703, "The Miller Act provides a federal cause of action, and the scope of the remedy as well as the substance of the rights created thereby is a matter of federal not state law." As the Fifth Circuit has noted, "Since prejudgment interest falls within the 'scope of the remedy' available . . ., its allowance must be initially determined as a matter of federal law." *United States ex rel. Georgia Electric Supply Co., Inc. v. United States Fidelity and Guaranty Co.,* 656 F.2d 993, 997 (5th Cir.1981). Although the federal court may look to state law "as a matter of convenience and practicality" to determine the appropriate remedy, *id.,*

---

**3.** The cost for each base is as follows: Bergstrom—$3,000, Cannon—$665, England—$37,-999, Holloman—$1,900, Hurlburt—$600, MacDill—$5,842, Myrtle Beach—$74,654, for a total cost of $124,660 in addition to the cost of the Apice crew. Avco did not claim against Elcon for correcting deficiencies at Shaw AFB other than for the Apice crew.

the party before the court in a Miller Act case seeks a remedy created by federal law, and therefore can request relief without subjecting himself to state penalties.

■ *Attorneys' Fees.* The Supreme Court has decided that federal rather than state law governs the award of attorneys' fees in Miller Act cases. *F.D. Rich,* 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703. Absent a contractual basis, attorneys' fees may be awarded only where the opposing party "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* at 129, 94 S.Ct. at 2165; *see also United States ex rel. Georgia Electric Supply Co., Inc.,* 656 F.2d 993. In this case there is no evidence that the plaintiff has acted in bad faith, vexatiously, wantonly, or for oppressive reasons. Accordingly, each party is to bear its own attorneys' fees.

Based on the foregoing findings of fact and conclusions of law, Elcon owes Avco $191,160 on Avco's counterclaim for the cost of correcting and completing Elcon's work. This amount is partly offset by the $82,000 retainage held by Avco. It is accordingly

**ORDERED, ADJUDGED,** and **DE-CREED** that **JUDGMENT** be entered for the defendant in the amount of $109,106, with interest to be allowed at the rate of 11.74% pursuant to 28 U.S.C. § 1961.