848 F.Supp. 1161 (1994)
UNITED STATES of America For the Use of ENDICOTT ENTERPRISES INC. t/a Enco, a Delaware corporation, Plaintiff,
v.
STAR BRITE CONSTRUCTION COMPANY, INCORPORATED, a New Jersey corporation, and Employers Insurance of Wausau, a Mutual Company, a Wisconsin corporation, Defendants.
Civ. A. No. 92-626-JLL.
United States District Court, D. Delaware.
April 5, 1994.
Noel E. Primos, of Schmittinger & Rodriguez, Dover, DE, for plaintiff Endicott Enterprises, Inc.
Rachel B. Mersky, of Walsh & Monzack, Wilmington, DE, and Thomas J. Hirsch, of Ocean Tp., NJ, for defendants Star Bright Const. Co. and Employers Ins. of Wausau.

*1162 FINDINGS OF FACT AND CONCLUSIONS OF LAW
LATCHUM, Senior District Judge.

I. INTRODUCTION
On October 28, 1992, the plaintiff, Endicott Enterprises, Inc., t/a Enco ("Enco"), brought this Miller Act, 40 U.S.C. §§ 270a-270d, action against defendants, Star Brite Construction Company, Inc. ("Star Brite") and Employers' Insurance of Wausau, A Mutual Company ("Wausau"), to recover amounts due for work it allegedly completed under its subcontract with Star Brite to perform the mechanical work of Star Brite's prime contract with the United States Government to renovate three airplane hangers at the Dover Air Force Base, Dover, Delaware.
Enco claims that it justifiably walked off the job because Star Brite repeatedly failed to make progress payments in accordance with the terms of its subcontract. It contends that it is entitled to damages for breach of contract.
Star Brite, conversely, contends that Enco was behind schedule and had been fully paid when it walked off the job. In addition, it claims that even if Enco had not been fully paid, it failed to give Star Brite adequate notice of its intention to do so pursuant to the subcontract. It counterclaims for damages it allegedly sustained when Enco unjustifiably stopped work.
This Court held a nonjury trial from Monday, January 10, 1994 to Thursday, January 13, 1994. After carefully considering the sufficiency and weight of the testimony adduced at trial, the demeanor of the witnesses who testified, the exhibits admitted into evidence, and the post-trial memoranda filed by the parties, the Court finds that Star Brite breached the subcontract by failing to pay Enco adequate progress payments in accordance with the terms of the subcontract and denies Star Brite its counterclaim. The Court enters the following findings of fact and conclusions of law as required by the Federal Rules of Civil Procedure, Rule 52(a).

II. FINDINGS OF FACT
1. This Court finds that Mr. Endicott, Enco's vice-president and chief witness at trial, was more credible than either Mr. Lynardakis or Mr. Smilios, Star Brite's supervisor and president, respectively, and chief witnesses at trial.
2. In late September of 1991, the United States of America ("government") and defendant Star Brite entered into three contracts whereby Star Brite agreed to perform alterations and renovations for buildings 779, 793, and 794 at the Dover Air Force Base, Dover, Delaware. (Docket Item ["D.I."] 1, ¶¶ 2, 4, 6.) The government agreed to pay Star Brite $689,920.00 for Building 779, $617,000.00 for Building 793, and $661,000.00 for Building 794. (Id.)
3. In early October of 1991 the defendant Star Brite, as principal, and defendant Wausau, as surety, executed a standard government form of payment bond to the government pursuant to the provisions of 40 U.S.C. § 270a. (Id., ¶¶ 3, 5, 7.) These bonds bound the defendants jointly and severally for $344,975.00 for Building 779, $308,500.00 for Building 793, and $330,500.00 for Building 794 if Star Brite failed to make all payments to all persons supplying labor and material for the three buildings. (Id.)
4. On January 3, 1992, Star Brite and Enco entered into a written subcontract whereby Enco was to provide all mechanical services and some mechanical materials for the three buildings. (PX 1.)[1] Under this subcontract, Star Brite was to pay progress payments on a monthly basis to ensure that Enco would have enough money to continue work on the project. (Id., Article 11.2.)
5. Star Brite was entitled to keep a 10% retainage from each progress payment. (Id.)
6. On January 13, 1992, Enco commenced work at the Dover Air Force Base. (PX 2.)
7. Enco submitted its bill to Star Brite for the work it had completed for a particular month at the end of that month or at the *1163 beginning of the next month, and payment by Star Brite was due within two to three weeks after that date. (D.I. 28, pp. 121-122; D.I. 27, pp. 5-6.)
8. For the work completed in January, Enco billed Star Brite $29,000. (PX 46.)
9. Enco experienced billing problems with Star Brite from the beginning. With respect to the January bill, Mr. Endicott testified that, "And the bill, I believe, was $29,000. They told us that we had only done $2,000 worth of work." (D.I. 26, pp. 8-9.)
10. Star Brite paid Enco for January's work with a check dated February 25, 1992, in the amount of $26,290.00. (PX 13.)
11. For work completed in February, Enco billed Star Brite $64,887.40 at the end of February or beginning of March. (PX 46.)
12. On March 17, 1992, George Lynardakis, Star Brite's supervisor, sent Enco a telegram informing them that Enco was falling behind schedule and directing Enco to correct the deficiency within 72 hours. (PX 3.)
13. Star Brite sent Enco a check dated March 27, 1992, for $32,500.00 (about one half of the amount due). (PX 14.)
14. In reply to Star Brite's March 17, 1992 letter, Enco sent a letter dated April 2, 1992, informing Star Brite that they were not behind schedule and had not been fully paid for the work they had completed. This letter warned that "[y]our blatant decrease of our invoices (which are based on the Government inspectors, Acceptance and Approval, reference Article 11.2 of the agreement) will be tolerated no further reference Article 4.7.1 of the agreement." The letter further informed Star Brite of deficiencies in Star Brite's work which impeded Enco's progress and requested a meeting. (PX 5.)
15. At the end of March or beginning of April, Enco invoiced Star Brite another $39,645.02 for the work completed in March, increasing the total amount invoiced to $133,532.42. (PX 46.)
16. In an effort to settle matters, Mr. Endicott met with Gus Poniros, who was affiliated in some way with Star Brite and was sent by Star Brite to meet with Mr. Endicott, on or about April 7, 1992. Mr. Poniros surveyed the work Enco had completed as of that date and the parties came to a settlement evidenced by six sheets of paper in Mr. Endicott's handwriting. (DX 1.) In exchange for lowering the $133,532.42 to $97,800.00, Enco received Star Brite's assurance that: (1) Star Brite would pay RE Micheals Co., a supplier, $10,000.00 on behalf of Enco the next business day; (2) Star Brite would pay Enco $25,000.00 the week of the 20th of April; and (3) the set of values breaking down the remaining $132,200.00[2] were values that Star Brite "could live with" and that Enco would be paid based on the agreed upon schedule.[3] (D.I. 26, p. 178; D.I. 28, p. 116; D.I. 29, p. 113; DX 1.)
*1164 17. Based on these assurances, Mr. Endicott changed Enco's April and May billing to reflect the agreement. (DX 13.)
18. Star Brite paid Enco $10,000.00 through a check dated April 7, 1992. (PX 15.)
19. Star Brite paid Enco $25,000.00 through a check dated April 23, 1992. (PX 16.)
20. On April 15, 1992, Star Brite sent another mailgram to Enco alleging that "sufficient job manning of contracts at Dover AFB, DE has not met the contractual requirements," that "repeated requests to fully complete all work to date have been ignored," and that "we have no alternative but to withhold any future payments until daily proper job manning has been accomplished and maintained." (PX 5.)
21. At the end of April or beginning of May, Enco billed Star Brite $39,050.00 for April. (PX 46, DX 13.)
22. Star Brite paid Enco $22,990.00 with a check dated June 1, 1992 ($17,000.00 less than what was due). (PX 17.)
23. Through a letter dated June 5, 1992, Enco gave Star Brite notice that it had stopped work in accordance with paragraph 4.7.1 of the subcontract and referenced its April 2, 1992 letter. (PX 7.)
24. Through a letter dated June 9, 1992, Star Brite informed Enco that "the government had approved only 36.55% for the line items included" in Enco's subcontract which only entitled Enco to $84,065.00 and that it had already paid $118,980.00. (PX 8.)
25. Enco wrote a letter dated June 10, 1992 to defendant Wausau to "pay all monies due Enco by Starbrite Construction" and enclosed a summary of its invoices and the payments they received to date. (PX 9.) This summary showed that Enco had billed $184,882.42 and that it received a total of $116,780.00.[4] (PX 46.)
26. Enco sent defendant Wausau another letter, dated June 19, 1992, which detailed the percentage of work completed in each building and concluded that $162,509.00 to $164,780.00 was due by Star Brite.[5] (PX 10.)
27. The value of the mechanical work in each of the buildings are: Building 779 $75,629.00; Building 793$81,895.00; and Building 794$72,476.00.[6]
28. At trial, Mr. Endicott testified that Enco, as of June 5, 1992, had completed 69.5% of work for Building 779; 76.5% for Building 793; and 58.5% for Building 794.[7] (PX 47, 48, 49.) Mr. Endicott calculated these numbers from contract progress reports *1165 submitted by Star Brite to the government. (D.I. 26, pp. 26-28.) These contract progress reports allocate the work to be completed in each building by line items. Each line item represents a percent of the total value of the contract for that building so that all the line items combined would add up to 100% of the contract price. (Id. at 29.) At trial, Mr. Endicott used these figures to estimate the percentage of work Enco had completed by identifying which line items and what part of a particular line item Enco was responsible for. Then he estimated what percentage Enco had completed and divided the percentage of the line item Enco was responsible for by the percentage of the line item completed by Enco to determine what percentage of its work it had completed.[8] Once Mr. Endicott estimated the percentage of the work Enco had completed, he then multiplied that percentage by the monetary value of the mechanical work for that building to determine the value of the work Enco completed. (D.I. 26, pp. 30-155.)
29. Star Brite contends that Enco's use of the contract progress reports it submitted to the government was improper. Star Brite argues that these reports are irrelevant to the subcontract between it and Enco because the percentages represented on the contract progress reports are percentages of the value of the total contract price between it and the government and not percentages of the subcontract price between it and Enco.[9] For *1166 instance, it contends that 2% on the contract progress reports for Building 779 represents 2% of $689,000.00 not 2% of $75,629.00. It argues that Enco could not have known how much profit and overhead Star Brite allocated to each line item. However, Star Brite's argument is based on a misunderstanding of how Enco used the progress reports. Star Brite seems to be under the impression that Enco actually took percentages of the $689,000.00 to determine how much it should be paid.[10] However, Enco does not actually use the $689,000.00 figure. Rather, it takes a ratio and uses the $75,629.00 figure. For instance, Mr. Endicott testified that for building 779, Enco was wholly or partly responsible for eight (8) of the twenty-seven (27) line items. These line items represented 36% of Star Brite's contract and Enco was responsible for about 20.5%, or about two-thirds of the work represented by those line items. Enco had completed 14.25% out of the 20.5%. (PX 27.) Mr. Endicott did not take 14.25% of $689,000.00 but rather took the ratio of 14.25 to 20.5 to determine what percentage of the mechanical work it completed for building 779. Once Mr. Endicott determined this percentage, he multiplied it by the $75,629.00. In fact, it is undisputed and Enco does not claim that Enco is entitled to percentages of $689,000.00 since this amount includes overhead and profit for Star Brite. Enco is merely using these contract progress reports as a reference to show the relative values of the amount of work it was responsible for and percentage of its work it completed.
30. Star Brite further objects to Mr. Endicott's break downs and estimates of the amount of work Enco completed because they are merely "guesses." This Court finds that although these numbers are only estimates by Mr. Endicott they are educated estimates. Mr. Endicott was at the buildings several times a week, was in contact with his workers, and even performed some of the work himself, and as noted above, this Court finds Mr. Endicott credible. (D.I. 26, pp. 158-163.)
31. Enco billed Star Brite $12,300.00 for the month of May. (DX 13; PX 46.)
32. Enco completed approximately $1,086.00 worth of work for the month of June.[11]
33. Using Enco's calculations from the contract progress reports, this Court concludes that Enco completed the following amount of work and Star Brite was behind on its progress payments in the following amount as of the end of April:[12]

*1167
Building 779: $75,629 × .695 = $ 52,562.00[13]
Building 793: $81,895 × .765 = $ 62,650.00
Building 794: $72,476 × .585 = $ 42,398.00
________________________________________________________________________________________
Total due as of June 5, 1992: = $157,610.00
May bill: = - $ 12,300.00
June bill: = - $ 1,086.00
________________________________________________________________________________________
Total value of work as end of April = $144,224.00
10% Retainage = - $ 14,422.00
________________________________________________________________________________________
Total due in late May = $129,802.00
Total paid as of June 5, 1992 = - $116,780.00
________________________________________________________________________________________
Total deficiency = $ 13,022.00[14]
34. Enco usually makes about three to three-and-a-half percent profit. (D.I. 28, pp. 128-130.)
35. According to Star Brite, Enco had only completed $84,065.00 to $101,087.00 worth of work as of June 6, 1992. (PX 8, 27.) However, this Court finds that Star Brite's estimates are unreasonably low. Although Star Brite contends that Enco was behind schedule, there is no evidence to support this contention other than the March 17, 1992 and April 15, 1992 mailgrams sent by Star Brite to Enco. In fact, there is credible and unbiased evidence to the contrary. Mr. Ron Dooley, the mechanical engineer for the government on the three buildings, testified at trial that Enco always seemed very timely and he was not aware of any manpower problems with Enco. (D.I. 28, p. 134.) He also testified that he was "very pleased with the quality" of Enco's work. (Id. at 135.) Mr. Dooley was involved with "the design of the mechanical systems for the buildings, and coordinated other portions, the architectural and electrical portions of the buildings, and also was involved with any problems that came up on the job, and to do a final inspection on the buildings, when we ultimately accepted them as being completed." (Id. at 133; emphasis added.) In addition, he was at the buildings one to three times a week. (Id. at 137.) Therefore, if any serious problems arose, Mr. Dooley would have been aware of them. There is a strong inference that if Mr. Dooley was not aware of any delays then there were no delays. The fact that Star Brite contends that Enco was behind while Enco was not behind leads this Court to conclude that Star Brite's estimates of the work Enco completed would be lower than the actual amount.
A letter dated August 5, 1992 which Star Brite sent to Enco further demonstrates Star Brite's tendency to underestimate the amount of work Enco completed and further erodes Star Brite's credibility before this Court. (PX 27.) In this letter, Star Brite estimated the amount of work Enco had completed using the contract progress reports. (Id.) During cross-examination, Mr. Smilios admitted that if the government approved Enco's work, Enco would be entitled to be paid for that amount:
A. ... If the government give me the 7 percent, ENCO, he going to deserve the whole thing. But if the government doesn't give me that, I have to take it from somebody.
Q. So going back to Exhibit 20. Since the government only gave you 6.8 percent, then you dock .5 off of ENCO and .035 off yourself? Is that a correct to look at it?
A. From myself I deducted.
Q. But if the government had given you 7.0 percent on that line item you would have given ENCO .75 percent, correct?
A. I would have given.
(D.I. 29, p. 86.)
However, the percentages Star Brite attributed to Enco show that Star Brite did not actually give Enco the full percent of work approved by the government. For instance, *1168 for line item 17 of Building 779, of the total 9% this line item represented, Star Brite estimated that it was responsible for 3% and Enco for 6%. The government had approved 8.3% of this line item. Assuming that Star Brite had completed all of its work, Enco should have been credited for 5.3% (8.3% - 3%). However, Star Brite only gave Enco 3.5%. Star Brite also gave Enco unreasonably low estimates for other line items.[15] (PX 27.)

III. CONCLUSIONS OF LAW

A. Applicable Law
In actions brought under the Miller Act, issues not involving the construction of the Act, such as ordinary contract issues, will be resolved by the law of the state where the contract is performed. United States, for the Use and Benefit of Greenville Equipment Company, Inc. v. United States Casualty Company, 218 F.Supp. 653, 657 (D.Del.1962); Austin Elcon Corp. v. Avco Corp., 590 F.Supp. 507 (W.D.Tex.1984). Since the contract was performed in Delaware, Delaware substantive law on contracts will apply in this action.

B. Notice
When a contract expressly states that a contractor or subcontractor give notice of its intention to stop work, the contractor or subcontractor must do so or it will be held in breach of contract. Fabrizio v. Fabrizio, 48 A.2d 375, 133 Conn. 108 (1946); Arthur L. Corbin, Corbin on Contracts § 692, at 269-271 (1960). Article 4.7.1 of the subcontract between Enco and Star Brite requires that before Enco stops work on the project it must wait seven days after a bill is due and then give an additional seven days written notice of its intention to stop work. (PX 1, Article 4.7.1.) Star Brite argues that Enco failed to give this written notice and thus breached the subcontract. However, this Court finds that Enco did give sufficient written notice before it stopped work on the project.
According to Star Brite, when Mr. Endicott met with Mr. Poniros he had agreed that Enco had only completed $97,800.00 worth of work as of the end of March and that there was a deficiency of only $38,500.00. By paying $35,000.00 (approximately, $38,500.00 minus the 10% retainage), Star Brite contends that it paid in full what was due through to the end of March. When Enco walked off the job in June, it argues that only the April invoice was due and that Enco failed to give an additional written notice for the April invoice, apart from the notice Enco had given in early April concerning the February bill.
However, Star Brite fails to recognize that a third part of the agreement, and the reason Mr. Endicott agreed to the lower $97,800.00 figure, was an assurance from Star Brite that it would pay Enco according to the new schedule. The $25,000.00 and $10,000.00 payments did not wholly cure the nonpayment from the January, February and March invoices. The April 2nd letter provided Star Brite sufficient notice of the fact that if they failed to make payments according to the April 7th agreement, Enco would stop work. *1169 On June 5, 1992, Star Brite had more than two months' notice and time to cure the default, and was well aware of the fact that if it underpaid on Enco's invoices again, Enco would stop work on the buildings.

C. Breach of Contract
Star Brite asserts that even if Enco had given notice pursuant to Article 4.7.1, Enco breached the subcontract. However failure to pay a progress payment justifies suspension and termination[16] of the subcontract by a subcontractor. Corbin on Contracts § 692 at 269-271, n. 34 & 36. Star Brite repeatedly failed to pay Enco progress payments in accordance with the terms of the subcontract.

D. Damages
In a breach of contract case, the amount of damages a plaintiff is entitled to is measured by what is necessary to place the plaintiff in the same position that he would have been in if the contract had been performed. Reiver v. Murdoch & Walsh, P.A., 625 F.Supp. 998, 1009 (D.Del.1985); American General v. Continental Airlines, 622 A.2d 1, 8 (Del.Ch.), aff'd, 620 A.2d 856 (Del. 1992); J.J. White, Inc. v. Metropolitan Merchandise Mart, 48 Del. 526, 107 A.2d 892, 894 (Super.1954). In this case, Enco is entitled to the value of the work they have completed minus any payments they have already received and in addition, lost profits.
The plaintiff also seeks interest. Under the Miller Act, whether to allow prejudgment interest is a matter of federal law. U.S. for Use of Seminole Sheet Metal v. SCI, Inc., 828 F.2d 671, 677 (11th Cir.1987); United States ex rel. Ga. Elec. Supply Co. v. United States Fidelity and Guar. Co., 656 F.2d 993, 997 (5th Cir. Unit B 1981). See F.D. Rich Co. v. United States ex rel. Indus. Lumber Co., 417 U.S. 116, 127, 94 S.Ct. 2157, 2164, 40 L.Ed.2d 703 (1974) ("scope of the remedy" under Miller Act is matter of federal law). However, since the Miller Act does not explicitly address prejudgment interest, it is treated as incorporating state law on this issue. Seminole Sheet Metal, 828 F.2d at 678.
Under Delaware law, a party is entitled to prejudgment interest when the amount of damage is calculable, and such interest has been awarded in breach of contract cases. F.E. Myers Co. v. Pipe Maintenance Services, Inc., 599 F.Supp. 697, 704 (D.Del.1984); Citadel Holding Corp. v. Roven, 603 A.2d 818, 826 (Del.Super.Ct.1992). Such interest is calculated from the date payment is due. Citadel Holding Corp., 603 A.2d at 826. Where the underlying obligation to make payments arises out of a contract, a Court should look to the contract to determine when interest begins to accrue. Id. When the contract does not specify an interest rate, 6 Del.Code § 2301(a) states that, "the legal rate of interest shall be 5% over the Federal Reserve discount rate including any surcharge as of the time from which interest is due." Del.Code Ann. tit. 6, § 2301(a) (1993).
Enco is entitled to a total of $43,002.00.[17] However, Star Brite was not obligated to pay Enco this entire sum at the same time. Interest on $13,022.00, the amount due for April, will run from May 22, 1992.[18] Interest on $12,300.00, the amount due for May, will run from June 26, 1992. Interest on $1,086.00, the amount due for June, will run from July 24, 1992. Interest on $2,172.00, *1170 the lost profit, will run from June 5, 1992. In addition, Star Brite was allowed to retain 10% of the progress payments until the project was approved by the government. Since Enco had justifiably stopped work on June 5, 1992 and other subcontractors, whom Enco had no control over, finished their work, this Court, in its discretion, will hold that Enco is entitled to interest on $14,422.00, the 10% retainage for the work as of the end of April, as of June 5, 1992.
As to postjudgment interest, under 28 U.S.C. § 1961, a party is entitled to postjudgment interest on any money judgment in a civil case recovered in a district court from the date of entry. 28 U.S.C. § 1961 (Supp. 1992). Therefore, Enco is entitled to postjudgment from the date of this judgment until the date of payment, "at a rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of the judgment." Id.

IV. CONCLUSION
The Court will enter a final judgment as follows:
(1) Judgment will be entered in favor of plaintiff Enco and against defendants Star Brite and Wausau on its claim for breach of contract for the following amounts:
(a) $43,002.00;
(b) prejudgment interest on $13,022.00 beginning May 22, 1992 to the date of this judgment, at the rate specified in 6 Del. Code § 2301(a);
(c) prejudgment interest on $12,300.00 beginning June 26, 1992 to the date of this judgment, at the rate specified in 6 Del. Code § 2301(a);
(d) prejudgment interest on $1,086.00 beginning July 24, 1992 to the date of this judgment, at the rate specified in 6 Del. Code § 2301(a);
(e) prejudgment interest on $16,594.00 beginning June 6, 1992 to the date of this judgment, at the rate specified in 6 Del. Code § 2301(a);
(f) postjudgment interest on $43,002.00 plus all accumulated prejudgment interest beginning the date of this judgment to the date of full payment, at the rate specified in 28 U.S.C. § 1961.
(2) Judgment will be entered in favor of plaintiff Enco and against defendants Star Brite and Wausau on Star Brite's counterclaim for breach of contract.
NOTES
[1] All plaintiff's exhibits will be referred to as "PX" and all defendant, Star Brite's, exhibits will be referred to as "DX."
[2] The parties broke down the remaining $132,200 ($230,000 - $97,800) of Enco's subcontract as follows:

_______________________________________________________________________________
 Building 779 Building 793 Building 794
_______________________________________________________________________________
Demo $ 3,000.00 $ 3,000.00 $ 5,000.00
_______________________________________________________________________________
Insulation $10,000.00 $ 7,000.00 $ 5,000.00
_______________________________________________________________________________
Boiler $16,000.00 $16,000.00 $16,000.00
_______________________________________________________________________________
Air Handler $ 7,000.00 $ 9,000.00 $ 8,000.00
_______________________________________________________________________________
Reg - $ 1,200.00 $ 500.00
_______________________________________________________________________________
Fan $ 3,500.00 $ 3,500.00 $ 3,500.00
_______________________________________________________________________________
Sheetmetal - - $ 5,000.00
_______________________________________________________________________________
Exhaust $ 5,000.00 - -
_______________________________________________________________________________
Plumbing $ 5,000.00 - -
_______________________________________________________________________________
_______________________________________________________________________________
Total work to be done $49,500.00* $39,700.00 $43,000.00
_______________________________________________________________________________
Total value of job $75,629.00 $81,895.00 $72,476.00**
_______________________________________________________________________________
* On DX 1, Mr. Endicott had a sum of $48,500.00. However, this is a mathematical error.
** DX 1 does not specifically state this number. However, the subcontract was for $230,000.00, and
$230,000.00 subtracted by $75,629.00 and $81,895.00 is $72,476.00.

[3] Mr. Endicott testified that:

A: ... The agreement that was made at this time was also that we would be paid for these items, as we completed these items, we would get paid for them. And at the end of that month, when we submitted this bill, based on what old Gus [Mr. Poniros] wanted to break it down as, and when we submitted the bill on that, we were not paid for that. So they did not live up to the initial agreement. They fulfilled part of it, but they did not fulfill all of it.
Q: The question was, you said they made no payments that they were required to make. In fact, they did make the two payments explicitly as you and Mr. Poniros agreed?
A: But they did not make the final payment.
Q: Did they make those two?
A: I look at it as, we sat down; we discussed three items; they fell down on the third one.
(D.I. 28, p. 116.)
[4] The summary sheet actually totalled the amount received as $107,780.00. However, this was a mathematical error since the actual total of the column labelled "amount received" is $116,780.00. (PX 46.)
[5] Star Brite contends that Enco conditioned their return to work on Star Brite paying $184,883.00. Star Brite argues that this demand was unreasonable, and thus Enco breached the subcontract. Whether this demand was unreasonable or not is immaterial since the facts clearly contradict Star Brite's contention. The June 5th letter mentioned no amount and although the June 9th letter to Wausau stated that $184,883.00 was due, the June 19th letter stated only $162,509.00 to $164,780.00 was due. (PX 7, 9, 46, 10.)
[6] Although many numbers were presented at trial, this set of numbers is the set agreed to by the parties at the April 7th meeting.
[7] Mr. Endicott testified to two sets of numbers at trial  one based on the numbers Star Brite submitted and one based on the numbers the government approved. This Court adopts the latter since both parties agree that Enco is entitled to be paid based on what is approved and accepted by the government.
[8] For example, Mr. Endicott testified to the following numbers for Building 779:

______________________________________________________________________________________
 % OF TOTAL % FOR % COMPLETED % COMPLETED
 LINE ITEMS JOB WHICH ENCO BY ENCO BY ENCO
 RESPONSIBLE (STAR BRITE) (GOVT)
______________________________________________________________________________________
 4. Selective Demolition 2.5 .5 .5 .5
______________________________________________________________________________________
 5. Fire Service Piping,
 Etc. 7.0 1.0 1.0 1.0
______________________________________________________________________________________
16. Plumbing Fixtures &
 Sewer Line 4.0 4.0 3.5 2.1
______________________________________________________________________________________
17. Support Anchors, Etc. 8.0/9.0 8.0/9.0 7.0 8.3
______________________________________________________________________________________
18. Metal Ductwork, Etc. 1.5 1.5 .5 0
______________________________________________________________________________________
19. Heat Exchangers, Etc. 2.0 1.0 .2 .25
______________________________________________________________________________________
20. Air Handling Units,
 Etc. 4.0 2.5 2.0 2.05
______________________________________________________________________________________
21. HVAC Controls, Etc. 3.0 1.0 14.9 14.25
______________________________________________________________________________________
______________________________________________________________________________________
TOTAL 19.5/20.5 14.9 14.25
______________________________________________________________________________________
% OF WORK COMPLETED BY ENCO (STAR BRITE) = 14.9%/19.5% = 76.4%
% OF WORK COMPLETED BY ENCO (GOVT) = 14.25%/20.5% = 69.5%
(PX 47.)

[9] In an effort to counter Star Brite's argument that the contract progress reports are irrelevant to the subcontract, Enco argues that the subcontract terms actually require that payments to Enco be based "on how much of Enco's work had been accepted and approved by the government under the government's contracts with Star Brite." Both parties present arguments concerning the interpretation of the subcontract terms concerning how Enco was to be paid. However, on closer examination, the dispute between the two parties is essentially a factual one. Both parties agree that Enco was entitled to be paid for all work which was accepted and approved by the government. What they disagree on is the value of the work completed by Enco. Star Brite contends that under the terms of the subcontract, Enco was required to submit a schedule of values and because Enco failed to do so both parties "simply took an overview of the contract trying to determine what percentage of the work had been completed as a whole as opposed to breaking it down to each line item." (D.I. 33, p. 23.) On the other hand, Enco contends that both parties agreed to use the government contract progress reports as a schedule of values. This Court sees no difference between these two approaches. They are both subjective estimates of the amount of work that was completed and the value of that work. Star Brite merely states a total value. Enco details how it arrived at that number, but still uses estimates. It is a matter of credibility, and this Court finds Enco's methodology and testimony more credible.

The subcontract terms do require Enco to submit a schedule of values (PX 1, Article 11.5), but there is no evidence that Enco ever submitted a schedule of values for January through March or that Star Brite ever required one. However, even if Enco had submitted a schedule of values, there would still be a factual dispute concerning the amount of work and the value of the work completed by Enco. This dispute is the crux of this case.
It should also be noted that Star Brite itself used the government contract progress report line items in its schedule of values as evidenced by a telefax sent to Enco by Star Brite on March 27, 1992. (PX 18.)
[10] In a letter dated August 5, 1993, Mr. Smilios used the contract progress reports to determine the percentage completed by Enco and multiplied that percentage by the total contract price for the building. (PX 27.)
[11] The government's contract progress reports for the week of May 30, 1992 to June 5, 1992 show that .05% of the line items which Enco was responsible for was completed for Building 779 during that period. (PX 20.) Assuming that all of the .05% was Enco's work, the bill for that period for Building 779 would be .05%/20.5% × $75,629.00 = $184.00. For Building 793, the progress reports show that .2% of the line items Enco was responsible for was completed during that period. (PX 22.) Assuming again that all of the .2% could be attributed to Enco's work, the bill would be .25%/18.16% × $81,895.00 = $902.00. Since 0% of the line items which Enco was responsible for was completed for Building 794 (PX 24), the most that Enco could have received for June would be $1,086.00.
[12] Although the parties presented evidence only of the work completed as of June 5, 1992, the crucial date to determine if Star Brite was overdue is the last day of April, since there was a lag between the time Enco completed the work and the time Enco was entitled to payment for that work. When Enco stopped work on June 5, 1992, only invoices for the work completed as of the end of April would have been overdue. Star Brite did not have to pay for the work completed in May until late June, and for the work completed in June until late July.
[13] These numbers are rounded to the nearest dollar.
[14] Star Brite contends that Mr. Smilios had offered Enco "by phone" another $10,000.00 for past performance. However, Mr. Smilios clearly stated at trial that this $10,000.00 would be in exchange for Enco's delivery to the job site of "the majority of the materials for the boiler rooms...." (D.I. 27, p. 195.) Since Star Brite has repeatedly emphasized, and Enco agrees to, the fact that when Enco stopped work on the buildings, none of the work in the boiler rooms had been completed, this $10,000.00 could not have been offered for past performance.
[15] The following represent the line items for which Star Brite failed to give Enco credit for:

 Line % given to % S.B.
 Item/total % % S.B. responsibility % Enco responsibility % Gov't approved Enco by should have
Building of contract S.B. given
--------------------------------------------------------------------------------------------------------------------------
793 14/9% 3% 6% 8.65% 3.75% 5.65%
--------------------------------------------------------------------------------------------------------------------------
793 15/3% 1% 2% 2.95% 1% 1.95%
--------------------------------------------------------------------------------------------------------------------------
794 4/1% .25% .75% .95% .6% .7%
--------------------------------------------------------------------------------------------------------------------------
794 13/12% 4% 8% 9% 4% 5%
--------------------------------------------------------------------------------------------------------------------------
(PX 20, 22, 24, 27.)

In addition, Star Brite failed to credit Enco for the line item entitled "selective demolition" in each building although in their telefax to Enco on March 27, 1992, they acknowledged that Enco was responsible for some part of that line item. (PX 18.)
[16] Article 7.1.1 states that: "The Subcontractor may terminate the Subcontract ... for nonpayment of amounts due under this Subcontract for 60 days or longer ..."
[17] As of June 5, 1992, Enco had completed $157,610.00 worth of work. (See Findings of Fact # 33.) Since Star Brite had paid $116,780.00 as of June 5, 1992, there is a deficiency of $40,830.00. In addition, Enco is entitled to lost profit at a profit of 3%. Three percent of $72,390.00 ($230,000.00 - $157,610.00) is approximately $2,172.00.
[18] Enco submitted its bills for a particular month at the end of that month or the beginning of the next month. Star Brite was then required to pay within two to three weeks after that date. (See Findings of Fact # 7.) Since there is no definite date the payment was due, this Court, in its discretion, chose the fourth Friday of the month.